# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PATRICIA HOLTZ, AUNT MARLENE FOUNDATION, STEVEN GREENSPON, and TERENCE HEUEL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>J.P. MORGAN SECURITIES LLC, JPMORGAN CHASE BANK, N.A., JPMORGAN CHASE & CO., and J.P. MORGAN INVESTMENT MANAGEMENT INC.,<br><br>Defendants. | **Case No. 12-CV-7080 (JWD)**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Patricia Holtz, Aunt Marlene Foundation, Steven Greenspon, and Terence Heuel (collectively, "Plaintiffs"), by and through their undersigned counsel, file this class action complaint against defendants J.P. Morgan Securities LLC ("JPMS LLC"), JPMorgan Chase Bank, N.A. ("JPMC Bank"), JPMorgan Chase & Co. ("JPMorgan"), and J.P. Morgan Investment Management Inc., (collectively, "Defendants"), individually and on behalf of all others similarly situated. The allegations in this Complaint are based upon personal knowledge as to matters concerning Plaintiffs and their own acts, and upon information and belief as to all other matters. The allegations that are not based on Plaintiffs' personal knowledge result from investigation by Plaintiffs' counsel. Plaintiffs believe that substantial additional evidential support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action for breaches of fiduciary and contractual duties brought on behalf of all financial advisory clients of Defendants from January 1, 2008 through the present (the "Class Period") whose funds were placed in Defendants' and/or their affiliates' proprietary mutual funds and investments and who were charged investment management fees by Defendants in exchange for skilled, competent, and objective investment research and analysis, which Defendants failed to perform (the "Class"). This class action alleges claims for breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Plaintiffs do not allege fraud, deceptive practices, misrepresentation, or material omission in connection with the purchase or sale of securities.

2.      Throughout the Class Period, Plaintiffs and other members of the Class entrusted their assets to Defendants and paid the Defendants investment management or advisory fees in exchange for investment advice and related services. Pursuant to this relationship, and in exchange for fees, the Defendants were obligated as fiduciaries and by contract to invest such assets in a responsible manner that would serve the best interests of their clients. The financial advisory services Defendants contracted to provide included providing objective research and analysis, analyzing and advising on alternative accounts and fee structures to maximize client returns, and providing investment management services. Performance of these services in the best interests of the client, with a duty of utmost loyalty, is at the heart of the financial advisor-client relationship.

3.      In derogation of such duties and obligations, Defendants instead instituted centralized policies and practices designed to obliterate the fiduciary and contractual responsibilities owed to clients by pushing and incentivizing their financial advisors to put the financial interests of Defendants ahead of the financial interests of the clients.  At the heart of such policies and practices was the decision – made at the most senior executive levels – to require Defendants' financial advisors to strongly push and sell their clients into own proprietary funds and investments, as opposed to those funds and investments managed by third parties.  As a result of this decision, and the policies and practices that flowed from it, Defendants were able to substantially grow their assets under management, while collecting not only the management fees that are the subject of this lawsuit, but also layers of additional fees collected by the JPMorgan-affiliated funds and investments themselves, and other JPMorgan-affiliated entities that managed and provided services to such JPMorgan funds and investments.

4.      During the Class Period, at a time when its competitors were abandoning the practice of placing their clients into proprietary funds principally due to the severe conflicts of interests, Defendants hired hundreds of new financial advisors and pressured and incentivized them to sell proprietary JPMorgan funds and investments to as many clients as possible, regardless of whether or not it was in the clients' best interests to make such investments, and in breach of the duty of loyalty owed to the clients.

5.      Because of Defendants' zeal to increase profits and market share, Defendants' financial advisors were awarded dramatically higher bonuses for steering clients into JPMorgan proprietary funds and investments.  Financial advisors were not provided with such high bonuses based on client performance, nor were they provided

with such bonuses for placing clients in non-JPMorgan-sponsored investments. These skewed incentives obliterated the duty of loyalty as Defendants' financial advisors ceased – at Defendants' directive – performing time-consuming research and analysis and were instructed to place as many clients as possible into as many of Defendants' proprietary funds and investments as possible, without regard for their clients' interests. Not surprisingly, the system worked well for Defendants, as JPMorgan dramatically increased its market share and profits from this segment of its business over the course of the Class Period.

6.      Defendants publicly admitted that their financial advisors owed fiduciary duties to their clients, including the duty to place their clients' financial interests ahead of their own. By utilizing a generous bonus structure that was designed to, and did, incentivize financial advisors not to perform the services owed by contract and as a fiduciary, and by otherwise pressuring financial advisors to forego any research or analysis of non-JPMorgan-sponsored funds and investments, the Defendants breached their contractual and fiduciary duties.

7.      Defendants additionally incentivized and pressured their financial advisors to "switch" clients from non-proprietary mutual funds and investments to proprietary JPMorgan funds and investments to earn the fees associated with the switch. Mutual fund "switching" raises concerns regarding whether the financial advisor is acting in his client's best interests because of the fees associated with the switch. Acting in accordance with the centralized incentive practices and policies implemented by senior management, Defendants' financial advisors dispensed with the research and analysis necessary to justify a "switch" and moved their clients over to JPMorgan proprietary

funds to generate fees that would be included in their bonus calculus. These switches were done for no other reason than to maximize revenues for Defendants' self-interested reasons and were contrary to client interests and not the result of research and analysis performed by the financial advisors. The switching was little more than a quick way for financial advisors to collect the outsized bonuses promised by Defendants.

8.      By putting their own financial interests ahead of the financial interests of Plaintiffs and the Class, and adopting centralized policies and practices to ensure that this would be so, Defendants breached their fiduciary duties and their contractual obligations to provide Plaintiffs and the Class with the skilled, objective, competent and honest financial advisory services for which they were paid. Since at least 2007, Defendants breached their duties to provide these services to their financial advisory clients and collected fees for services that they did not perform and that they did not earn. By this action, Plaintiffs and members of the Class seek to recover these management fees.

## PARTIES

### A.      Plaintiffs

9.      Plaintiff Patricia Holtz is a resident of Brookfield, Illinois. Plaintiff at all times relevant hereto contracted to receive financial advisory services from JPMS LLC (through its successor Chase Investment Services Corp. discussed below) and, as described below, was wrongfully subject to the conduct complained of herein.

10.      Plaintiff Aunt Marlene Foundation is a resident of Chicago, Illinois. Plaintiff at all times relevant hereto contracted to receive investment management services from JPMC Bank and, as described below, was wrongfully subject to the conduct complained of herein.

11.     Plaintiff Steven Greenspon is a resident of Lemont, Illinois.  Plaintiff at all times relevant hereto contracted to receive investment management services from JPMC Bank and, as described below, was wrongfully subject to the conduct complained of herein.

12.     Plaintiff Terence Heuel is a resident of Riverside, Illinois.  Plaintiff at all times relevant hereto contracted to receive financial advisory services from JPMS LLC (through its successor Chase Investment Services Corp. discussed below) and, as described below, was wrongfully subject to the conduct complained of herein.

**B.     Defendants**

13.     Defendant J.P. Morgan Securities LLC ("JPMS LLC") is a Delaware limited liability corporation with a principal office at 383 Madison Avenue, New York, New York.  JPMS LLC is a SEC-registered broker-dealer and investment advisor, and and member of the Financial Industry Regulatory Authority ("FINRA") with over 1,200 financial advisors.  JPMS LLC is indirectly owned by JPMorgan, and under its control.

14.     Defendant JPMS LLC is the successor by merger as of October 1, 2012 to Chase Investment Services Corp. ("CISC") which was initially named as a Defendant. CISC is a Delaware corporation with its principal executive offices located at 300 South Riverside Plaza, 7th Floor, Chicago, Illinois.  Before the merger, CISC was at relevant times below an SEC-registered broker-dealer and investment advisor, and member of the Financial Industry Regulatory Authority ("FINRA") with over 1,700 financial advisors. CISC was also indirectly owned by JPMorgan, and under its control.

15.     Defendant JPMorgan Chase & Co. ("JPM") is a Delaware corporation with its principal executive offices located at 270 Park Avenue, New York, NY 10017.

Shares of JPM trade on the New York Stock Exchange under ticker symbol "JPM." JPM is a leading global financial services firm with assets of $2.3 trillion and operations worldwide, and with $189.73 billion of shareholder equity as of March 31, 2012. The firm is a leader in investment banking, financial services for consumers and small businesses, commercial banking, financial transaction processing, asset management, and private equity. A component of the Dow Jones Industrial Average, JPM serves millions of consumers in the United States and many of the world's most prominent corporate, institutional and government clients under its JPMorgan and Chase brands.

16. Defendant J.P. Morgan Investment Management Inc., which is also known as JPMorgan Asset Management Holdings Inc., is a Delaware corporation with its principal executive offices located at 270 Park Avenue, New York, NY 10017. The company is a wholly owned subsidiary of Defendant JPMorgan Chase & Co. The company is an investment adviser registered under the Investment Company Act of 1940. It has over six hundred registered representatives servicing approximately sixteen hundred clients throughout the United States and abroad, comprising over $700 billion in assets under management.

17. During relevant times, JPMorgan controlled JPMC Bank and JPMS LLC, through which Plaintiffs and their accounts were managed. On its annual Form 10-K reports, JPMorgan described "Asset Management" as one of its business segments, and provided the following chart reflecting its separate business lines:



**See http://www.sec.gov/Archives/edgar/data/19617/000095012310016029/e82150e8215002.gif**

18.     In addition, JPMorgan, through its affiliates, controls also the proprietary funds and investment products offered by its subsidiaries which are the subject of this complaint.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because at least one member of the class is a citizen of a state different from at least one defendant, the aggregate amount in controversy exceeds $5,000,000.00, and less than two-thirds of all Class members reside in the State of Illinois.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Defendants are located or conduct business in this District, a substantial part

of the Defendants' conduct giving rise to the causes of actions occurred within this District, and the named plaintiffs reside in this district.

## SUBSTANTIVE ALLEGATIONS

### A. Defendants Owed Fiduciary Duties To Their Clients

21.     JPMorgan, through its subsidiaries JPMS LLC and JPMC Bank, is one of the largest financial services companies in the world.  Through its subsidiaries, JPMorgan offers private banking and wealth management services through investment accounts that are managed by its financial advisors and investment representatives.  Through its subsidiaries, JPMorgan also offers several different managed account or wrap account programs that are available to investors. .

22.     The financial advisors and representatives employed by both JPMC Bank and JPMS LLC were obligated to assist clients in managing their finances or investments by providing objective guidance and advice regarding investments, estate planning, and retirement.  These financial advisors also had the authority to make, and did make, investment decisions for their clients.  Defendants publicly admitted (and admit) that their financial advisors owe(d) fiduciary duties to their clients, including the duty to place their clients' financial interests ahead of their own.  Fiduciary duties also exist where, as here, clients have placed trust and confidence in a financial advisor to provide guidance or act in the clients' best interest.  By virtue of their special relationship with their clients, financial advisors implicitly admit that there is an adequate basis for the opinions that he or she renders.  Further, industry standards and customs require financial advisors to research and investigate securities before placing clients in investments.  By virtue of this role, Defendants and the financial advisors they employed owed fiduciary duties of

loyalty to their clients, including Plaintiffs and members of the Class. Consistent with these duties, the Defendants were obligated to act in the best interests of their clients, to the exclusion of all other interests and influences.

23.     Defendants acknowledged and embraced the existence of a fiduciary relationship between them and their clients. Indeed, through the date of the filing of this Complaint, the website for JPMorgan's Asset Management Division contained the following description of the fiduciary duties owed to its clients:



24.     In addition, JPMorgan's website for its Asset Management Division described its Global Business Principle as follows:

> Throughout our long and distinguished history, we have been steadfastly committed to putting **our clients' interests first**.
>
> **This fiduciary relationship defines our relationship with clients and informs the basis of every decision we make on their behalf.** This core principle is the foundation of our business as we work to understand our clients' needs, offer informed advice, execute strategies to provide excess alpha performance and world-class client solutions. (Emphasis added.)

25.     Moreover, the Private Banking division defined its mission on JPMorgan's website as follows:

In everything we do, excellence and integrity are the guiding principles. … **Integrity means keeping your interests front and center always**…. (Emphasis added.)

26.     Before the merger, JPMS LLC held out on JPM's website that "[w]e will work closely with you to understand your unique needs and create solutions designed to help you meeting your financial goals."

27.     Similarly, in discussing its relationship with clients, CISC provided on its website that "it is our responsibility to look at the world of investing through your eyes," and that its "investment products and services are tailored to enhance your complete financial situations."   CISC also stated that its clients "will have access to over 900 individual funds from a wide selection of fund families."

**B.      In Addition To Their Fiduciary Duties, Defendants Had Separate Contractual Obligations To Their Clients Arising From Their Account Agreements**

28.     Defendants also owed contractual obligations to Plaintiffs and the other members of the Class pursuant to the standardized account agreements executed by and between Defendants and Plaintiffs and members of the Class.   Under their financial advisory agreements, Defendants contracted to comply with all laws, rules, and regulations applicable to banks, brokerage firms, and investment advisors, as well as customs and standards in the financial services industry, representations made in marketing and advertising, and duties arising from common law.

29.     Defendants were required to discharge their obligations under these agreements in a commercially reasonable manner and in accordance with the covenant of good faith and fair dealing implied under every contract.

30.     Indeed, Defendants agreed to act in the best interest of its clients and committed to "exercise discretion" and perform duties "consistent with applicable fiduciary standards."

31.     In order to satisfy these financial advisory agreements, Defendants were, among other things, obligated to (i) conduct thorough and accurate research of investments and market conditions, and (ii) manage investments in the best interests of the client.  In addition, Defendants were required to disregard their own economic interests where they conflicted with those of their clients.

32.     As described in greater detail herein, Defendants failed to satisfy their contractual obligations under the financial advisory agreements and breached the implied covenant of good faith and fair dealing, resulting in economic harm to Plaintiffs and the other members of the Class.  This economic harm was part and parcel of a strategy implemented and executed by Defendants, and their senior managers, which was designed to breach these contractual duties so that Defendants' economic interests were placed ahead of the interests of Defendants' clients.

**C.     Defendants' Managed Account Programs Had Uniform Duties To Account-Holders As Reflected In Brochures Filed On SEC ADV Forms**

33.     Defendants had several investment management or wrap fee account programs which were offered to customers.  Under each of these programs, depending upon how it is structured, JPMorgan will select a fund or investment manager for the customer, and monitor the fund or investment manager.  The performance of these obligations of JPMorgan are at the core of the contractual and fiduciary duties owed to its customers which were corrupted as discussed below.

12

34.     Upon information and belief, the customer account agreements for Defendants' "Managed Mutual Funds Portfolio" program, which is and was an advisory services program that selected and monitored mutual funds for its account-holders, contained the provision that "JPMorgan Funds undergo the same initial due diligence and ongoing monitoring that unaffiliated third party mutual funds in the Program undergo, and must meet the Program's same qualitative and quantitative criteria for inclusion."

35.     Defendants also had managed account programs where the firm or its individual financial advisors make the investment management decisions for the account-holders.  In a recent "Brochure" filed with the SEC as a schedule to Form ADV, Defendants provided the following description of the services provided under its programs:

> In formulating investment advice or managing assets in the Program, JPMS (through the Advisory Representatives) uses various methods of analysis, including:
>
> - fundamental analysis, typically an effort to measure the intrinsic value of a security through analysis of the issuer itself, its financial statements and condition, its management and competitive advantages, and its competitors and markets;
>
> - technical analysis, typically involving the study of data generated by market activity, such as past security prices and volume, in an effort to identify patterns and trends that may suggest a security's future price performance; and
>
> - cyclical analysis, generally involving the examination of macroeconomic and market trends as a guide to forecasting security prices.
>
> The method(s) of analysis used for purposes of the management of a client's Program account varies from Advisory Representative to Advisory Representative and depends on the individual practice and investing philosophy of the Advisory Representative.

36.     This summary of the analysis performed by Defendants for its customers under this advisory program fairly reflects the duties assumed implicitly by any investment manager, who assumes management obligations for a fee.  The SEC-filed "Brochure" for these managed account programs also provide that JPMorgan's advisors are "subject to substantially the same selection and review processes and criteria," as other advisors.

37.     In recent SEC-filed Brochures for other programs including the Chase Strategic Portfolio program, there is the same provision that JPMorgan funds are evaluated on the same criteria as unaffiliated funds.

38.     The Brochure for Defendants' Chase Strategic Portfolio describes the program as follows:

**A Customized Solution**

**The Chase Strategic Portfolio is a fee-based investment advisory program that brings together world-class investment management capabilities, people and processes to deliver an innovative investment experience you won't find anywhere else.**

In a Chase Strategic Portfolio, your investment will be:

- **Broadly diversified** across multiple quity and fixed income asset classes to deliver an optimal portfolip of investments.

- **Professionally managed** and blended among a variety of investments to enhance returns while reducing risk and dependency on a single Investment Manager's performance—a portfolio may include mutual funds, exchange traded funds, separately managed accounts and money market funds.

- Carefull constructed for your **investment objective** and consolidated into one comprehensive account.

39.     The Chase Strategic Portfolio also references these services provided to investors:

14

- "Together, you [and your financial advisor] will select from our 35 distinct investment portfolios to find one designed for your unique financial goals."

- "Chase Strategic Portfolios are constructed based on risk analyses and historical asset class returns."

- "All Investment Managers are selected by Chase Investment Services based on a rigorous screening process, which favors long-term, risk-adjusted performance."

- "Face-to-face meetings are conducted with every Investment Manager to look beyond the numbers."

- "[We] screen risk and return statistics from a wide range of Investment Managers"

- "[We] indentify Investment Managers with experience, a defined investment process and suitable risk management techniques."

- "Ongoing performance review and oversight of Investment Managers."

40.     The services, duties and obligations reflected in these Brochures filed by Defendants as attachments to their SEC Form ADV evidence contractual duties owed to Plaintiff and the Class under their managed account programs.  In particular, the provision applying the "same criteria" to JPMorgan funds was a fundamental obligation incorporated in some cases explicitly, and otherwise impliedly, into the account agreement.

**D.      In The Pursuit Of Greater Profits, Defendants Institute A Policy To Push Their Proprietary Funds And Investments On Clients**

41.     By late 2008, the United States was in the throes of what many economists consider the worst financial crisis since the Great Depression.  Large banks, including JPM, were at the epicenter of this economic crisis.

42.     In an attempt to recover from declining profits and to bolster JPM's diminished balance sheet, Defendants dedicated more resources to placing their financial

advisory clients into Defendants' proprietary funds and investments with fee-based accounts that were not in their best interests. This new strategy allowed Defendants to collect account management fees from clients, as well as fees associated with the transfer of those investments into Defendants' proprietary funds and investments in many cases (*i.e.*, upfront fees).

43. Placing clients' money in proprietary funds and investments is a controversial practice that many companies, such as Morgan Stanley and Citigroup, have abandoned because of the clear conflicts of interest that are implicated. By 2011, in fact, JPMorgan was the only bank among the 10 largest fund companies still engaging in this practice, according to the research firm *Strategic Insights*.

44. *The New York Times* has reported that the policies and practices implemented by Defendants to incentivize their financial advisors to act contrary to their fiduciary and contractual duties emanated from the very top of JPMorgan's senior management. According to *The New York Times*, which relied on two company executives who spoke to *The New York Times* anonymously, JPMorgan's chief executive officer ("CEO"), Jamie Dimon, at first balked at the idea of pushing JPMorgan's proprietary funds and investments on clients. However, Mr. Dimon relented after Jes Staley, then head of JPMorgan's Asset Management Division (and now head of JPMorgan's Investment Banking Division), successfully argued to him that the Company should ramp up its focus on steering clients into proprietary funds and investments in order to collect more fees and "earn" more profits.

45. Thus, while similarly situated institutions were cutting jobs, JPMorgan set out to grow its proprietary product management arm, adding hundreds of financial

16

advisors to its employee roster.  Since 2008, JPMorgan has added hundreds of financial advisors in its branches, bringing its total to roughly 3,100.

46.     At the center of JPMorga's push are managed and fee-based accounts like the Chase Strategic Portfolio ("CSP"), which JPMorgan heavily promoted in its bank and brokerage branches around the country.  The CSP is a fee-based investment-advisory program that combines roughly 15 mutual funds, some developed by JPMorgan and some not.  It is purportedly intended to offer ordinary investors holdings in stocks and bonds, with six main models that vary the level of risk.

47.     In the press release announcing the launch of the CSP, JPMorgan reiterated its commitment to the fiduciary relationship it has with its clients, stating that "[a] financial advisor uses a client's individual goals, financial needs and risk tolerance to help determine an appropriate asset-allocation strategy, and then the best portfolio." JPMorgan, however, was unconcerned with conducting the research necessary to identify the "best portfolio" – choosing instead to use its own proprietary funds and investments to profit through the constant flow of account and management fees.

48.     The CSP account product has been a boon for Defendants.  In the four short years since its creation, this fund has amassed roughly $20 billion in assets, according to *The New York Times.*  While an independent financial planner may charge a one-percent fee to manage assets for ordinary investors, JPMorgan charged an annual fee as high as 1.6 percent of assets to some customers in the CSP account.  On top of this, JPMorgan collected upfront fees for steering clients from non-proprietary fund families into JPM-sponsored fund families, as well as collecting fees from the proprietary funds and investments themselves.

17

**E.      Defendants Adopted Policies To Incentivize And Pressure Their Employees to Place Clients In Defendants' Proprietary Funds And Investments To Maximize Profits**

49.      Defendants' bonus and incentive structure was at the heart of JPMorgan's centralized strategy to maximize profits. Defendants financially incentivized their financial advisors to cease performing honest and competent account management services for clients and instead pressured and incentivized their financial advisors to cause clients to be placed in proprietary funds and investments on which JPMorgan would earn substantial management fees.  This skewed policy and practice caused Defendants to breach the fiduciary and contractual obligations owed to Defendants' clients.

**1.      Defendants Provided Improper Financial Incentives To Their Financial Advisors To Place Clients In Defendants' Proprietary Funds And Investments**

50.      Defendants generously rewarded their employees for placing clients into funds and investments managed by JPMorgan affiliates or subsidiaries.  To induce their financial advisors to breach their fiduciary duties and contractual obligations to their clients,  Defendants promised large bonuses and other benefits to employees who were able to reach certain benchmarks, which only came from ignoring their fiduciary and contractual responsibilities by placing clients in JPMorgan proprietary funds and investments, regardless of whether such investments were in the clients' best interests.

51.      According to a July 2, 2012 article in *The New York Times* entitled "Former Brokers Say JPMorgan Favored Selling Bank's Own Funds Over Others," numerous former JPMorgan financial advisors acknowledged that the incentives and pressure placed on them to sell JPMorgan funds and investments, without researching and analyzing alternatives as expected by their clients, was substantial.  Quotas were set

and high bonuses were promised to those financial advisors who used proprietary funds and investments, rather than other independently-researched alternatives. The work environment created by senior management's skewed incentive policies was such that the financial advisors could not survive if they performed the services that they were supposed to for their clients.

52. For example, JPMorgan established a compensation structure that was not based on client performance, but instead was based on certain "Metrics" that resulted in a "salary plus bonus" compensation structure incentivizing employees to sell certain products and meet sales quotas similar to a commission-based system. The vast majority of the employees' compensation came from the "bonus" portion of the "salary plus bonus" system, with the "bonus" factoring in the employees' performance in obtaining net new clients, assets management, revenues, and "flows" for JPMorgan.

53. Under JPMorgan's "Metrics" system, "bonuses" were paid to sales teams which, in turn, had discretion to funnel the bonus pool to the salesmen who produced the most for JPMorgan. This incentivized JPMorgan employees to push new proprietary products even if the client did not need them and to sell existing investments so that the client had the cash or margin available to buy proprietary JPM investments.

### 2. Defendants Placed Extraordinary Pressure On Their Financial Advisors To Place Defendants' Clients In Their Proprietary Funds And Investments

54. In addition providing their financial advisors with improper financial incentives, Defendants subjected their financial advisors to intense pressure to place clients in proprietary products in breach of the fiduciary duties and contractual obligations owed to clients. Notably, Defendants' employees were instructed not to

bother conducting the research and analysis necessary for client investments, in breach of their fiduciary and contractual obligations to their clients.

55.     As reported in a July 11, 2012 article in *The New York Times* entitled "Many Regulators Put Their Attention on How JPMorgan Marketed Its Funds," "[s]everal brokers told *The New York Times* that they had been encouraged to favor [JPMorgan] funds, and they described a broader culture that emphasized sales over client needs."  Warren Rockmacher, a broker who recently left JPMorgan, said: "It was all about the money, not the client."  As *The New York Times* reported, Mr. Rockmacher said that, if he did not persuade a client to invest in the CSP, a manager would ask him why he had selected something else.  This type of scrutiny from a supervising manager represents undue pressure intended to cause, and causing, the breaches of fiduciary duties and contractual obligations described herein.

56.     As another example, JPMorgan management sent an email to certain employees warning that management would "recognize those Teams that accomplish their goal [*i.e.*, investment quota] as well as those that do not.  Enough said?"

57.     According to a July 3, 2012 article in *The New York Times* entitled "Conflict Seen in Sales Tactic at [JPM]," JPMorgan made it a point to honor those employees that sold the most proprietary funds and investments by circulating a list of financial advisors whose clients collectively have the largest amounts in the CSP, with "[t]op advisors hav[ing] nearly $200 million of assets in the program."

58.     JPM also instituted a practice of holding Monday morning conference calls (the "Monday Morning Calls") in which all financial advisors and branch managers were encouraged to call in to hear the latest investment ideas from JPMorgan's portfolio

management team in New York. These calls – which emanated from JPMorgan's home office and which were often led by Mary Erdoes, the CEO of JPMorgan's Asset Management Division – would regularly encourage financial advisors to sell this or that JPMorgan proprietary fund above all else, stating that no other research or analysis needed to be done because it was already vetted and approved by the portfolio management team in New York.

59.     In this way, the message emanating from the top was clear: sell JPMorgan proprietary products, and especially CSP, because those that do will be rewarded, and those that do not, will be ignored and left behind. As Mathew Goldberg, a former JPMorgan financial advisor, explained: "It said financial advisor on my business card, but that's not what JPMorgan actually let me be. I had to be a salesman even if what I was selling wasn't that great."

60.     Additionally, JPMorgan supervisors put pressure on financial advisors to sell proprietary funds through the supervisory review process. If unaffiliated mutual funds were selected, the financial advisor was at greater risk for a compliance or surveillance review for concentration levels. Financial advisors who did not sell proprietary funds would receive Letters of Education, or other disciplinary action taken against them.

### F.     Defendants Breached Their Fiduciary Duties And Contractual Obligations To Clients In Order Generate Profits And Market Share

61.     The extraordinary financial incentivizes provided to, and pressures placed on, Defendants' financial advisors had their intended effect: Defendants' financial advisors ignored their fiduciary duties and contractual obligations to their clients and instead pushed clients into Defendants' proprietary funds and investments, regardless of

21

whether these investments were in their clients' best interests, allowing Defendants to grow their assets under management and to collect substantial management (and other) fees.

62.     Defendants' strategy – and the centralized policies and practices implemented to foster it – worked, generating tremendous fees from investments in Defendants' proprietary funds and investments, and causing Defendants' employees to stop performing the core services required by their fiduciary duties and contractual obligations (including, without limitation, the performance of skilled, objective and honest research, due diligence and analysis for clients, and the analysis of account and fee structure alternatives).

63.     To take an example that is typical of what members of the Class experienced, in an email to Peter Landgraff ("Landgraff"), a Managing Director of JPMorgan, one JPMorgan client complained that "I have paid almost 50% in fees" in connection with his JPMorgan investment.  In another email, the client asked to cancel his investment in JPMorgan proprietary funds, complaining that all he has "done is pay fees."

64.     As another example, Landgraff sent an email advising a client to invest in JPM's funds.  The client requested "bricks and mortar" investments that were highly liquid.  Instead of conducting research to understand the investments that the client targeted, Landgraff blindly recommended high-risk, illiquid JPMorgan funds that bore no resemblance to the types of investments that the client wished to purchase.  Landgraff pushed his client into JPMorgan mezzanine funds and was later forced to admit that he

had no understanding of what mezzanine financing actually was. But since it was a JPMorgan fund that he was incentivized and otherwise pressured to sell, he pushed it.

65.     Following Defendants' policy to place clients in their proprietary funds and investments, Landgraff shirked his fiduciary duties and contractual obligations to conduct the research necessary to advise his client appropriately, opting instead to peddle more JPMorgan proprietary funds to enable JPMorgan to collect substantial fees.

66.     Ultimately, JPMorgan's practice of foisting its proprietary funds and investments on clients to generate substantial management fees was successful. JPMorgan's mutual fund assets grew 29% to $114.7 billion from 2009 to 2010. In 2010, JPMorgan's mutual funds drew in over $18.6 billion, solidifying JPMorgan's place as the second most productive firm in the market at the time. Defendants' obtained this level of "success" at the expense of their clients in breach of their fiduciary duties and contractual obligations.

67.     JPMorgan has already been partially called to account for its improper practices of favoring its proprietary funds and investments over those of other firms. In a 2011 arbitration case, JPMorgan was ordered to pay $373 million to resolve allegations that it had improperly favored its proprietary funds over those of another firm. This judgment, while substantial, amounts to a slap on the wrist compared to wide-ranging, centralized strategy that impacted all JPMorgan financial advisory clients.

68.     As a result of Defendants' practice of pushing their clients towards proprietary funds and investments, regardless of whether these products were in their clients' best interests, Plaintiffs and the other members of the Class suffered damages that were a direct, foreseeable, consequential and proximate result of Defendants' breaches of

their contractual obligations and fiduciary duties. Plaintiffs and the other members of the Class suffered damages as a result of the breaches of fiduciary duties and contractual obligations described herein.

### G. Defendants Improperly "Switched" Clients To Proprietary Funds From Other Fund Families To Obtain Additional Profits

69.     In addition to pushing for new investments in proprietary funds and investments, Defendants pressured and incentived their financial advisors to engage in the questionable practice of "switching" their clients' existing investments from non-JPMorgan mutual funds to JPMorgan proprietary investments. Because mutual funds are generally considered long-term buy-and-hold investments, which have fees typically associated with short-term redemptions and switches, unjustified "switching" among fund families raises serious concerns about whether the financial advisor is acting in the client's best interests. The better practice is for financial advisors to exchange funds within the same family of funds and avoid "switching."

70.     Defendants' encouraged "switching" for two reasons. First, Defendants could collect substantial redemption or upfront fees charged to the client when the switch is completed. Second, Defendants would thereafter collect annual management fees for the funds that were moved from the non-proprietary fund or investment to the proprietary fund or investment.

71.     Because of the number of ways that Defendants could benefit from "switching" from one fund family to another, Defendants' financial advisors are required to justify and document the reasons for a switch between fund families. Defendants offered bonuses and other incentives to insure that the extra scrutiny would not deter its financial advisors from "switching." In essence, Defendants incentivized its financial

advisors to take actions that were likely contrary to the best interests of their clients to further JPMorgan's interest in bringing the largest amount of investor funds as possible into the JPMorgan fund family.

72.     Among the more glaring examples of JPMorgan's fund switching, JPMorgan exploited its contacts with former Washington Mutual Bank ("WaMu") account holders to generate substantial fees from fund switching.  On September 25, 2008, the FDIC was appointed Receiver for WaMu, and transferred all of WaMu's assets and liabilities to JPMorgan.  This acquisition included over $490 billion assets and deposits, 5,400 former WaMu branches across 23 states, and over 43,000 WaMu employees.  In the first two quarters of 2008, WaMu earned $45.7 million from mutual fund and annuity fees.

73.     The client assets and accounts acquired from WaMu presented a perfect opportunity for Defendants to increase their assets under management and the management fees associated therewith.  To ensure that this opportunity was not missed, Defendants pressured their financial advisors, including former WaMu advisors, to switch WaMu's clients into fee-based account structures and from non-proprietary funds to JPMorgan proprietary funds and investments, without conducting the research, analysis and due diligence to establish that these account changes and switches were justified and in the best interests of the clients.

74.     The WaMu account-holding clients who became Defendants' account-holding clients paid fees expecting to receive competent and diligent core services. Instead, these clients were exploited by being switched to JPMorgan proprietary funds from other fund families simply to generate increased fees for Defendants.

**DEFENDANTS' MISCONDUCT CAUSED THE CLASS SUBSTANTIAL HARM**

75.     As a result of the misconduct described herein, all members of the Class were harmed by being forced to pay substantial fees for investment advisory services that they did not receive.  Those members of the Class who were improperly switched from non-proprietary funds and investments to Defendants' proprietary funds and investments suffered the additional harm of being forced to pay upfront fees associated with the switch.

76.     Further, Defendants have been unjustly enriched by their retention of these investment advisory fees.  Because Defendants did not provide the investment advisory services for which they purportedly earned the substantial fees they collected from members of the Class, it is unjust for Defendants to retain these fees.

**CLASS ACTION ALLEGATIONS**

77.     Plaintiffs bring this action as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class consisting of all financial advisory clients of Defendants from January 1, 2008 through the present (the "Class Period") who were charged investment management fees by Defendants in exchange for skilled, competent, and objective investment research and analysis, which Defendants failed to perform (the "Class").  Excluded from the Class are (i) Defendants; (ii) Defendants' directors, officers, parents, affiliates, subsidiaries, and successors; (iii) Defendants' 401(k) plan or plans, (iv) any person who participated in the wrongdoing alleged herein; and (v) the legal representative, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assignees of any such excluded party.

78.     The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

79.     Specifically, the members of the Class are so numerous that joinder of all members is impracticable.  Although the precise number of Class members is unknown to Plaintiffs at this time and can be determined only by appropriate discovery, it is reasonably estimated that the Class consists of hundreds of thousands, or millions, of members who are geographically dispersed throughout the United States.

80.     Because Plaintiffs, at all times relevant hereto, were clients of the Defendants and paid the same or closely similar fees for services that were not performed, Plaintiffs are members of the Class whose claims are typical of the claims of the members of the Class.  All members of the Class were Defendants financial advisory clients who were damaged by the conduct complained of herein, and the harm suffered by Plaintiffs and the other members of the Class is the same and was caused by the same conduct of Defendants.

81.     Plaintiffs will fairly and adequately represent and protect the interests of the Class, in that Plaintiffs have no interests antagonistic to or in conflict with those of the Class.  To ensure such protection, Plaintiffs have retained competent legal counsel who are experienced in class action litigation and who intend to prosecute this action vigorously.

82.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over any questions that may affect individual members of the Class, including:

a)      Whether Defendants breached contractual obligations to Plaintiffs and the other members of the Class;

b)      Whether Defendants breached, or aided and abetted breaches, of fiduciary duties owed to Plaintiffs and the other members of the Class;

c)      Whether Defendants failed to perform the services for which Plaintiffs and the other members of the Class expected and paid as financial advisory clients;

d)      Whether Defendants have been unjustly enriched as a result of the breaches of fiduciary duties and contractual obligations described herein; and

e)      The extent of damage sustained by the members of the Class and the appropriate measure of damages.

83.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable, and prosecution of this action as a Class action will reduce the possibility of repetitious litigation. Information concerning the accounts of Plaintiffs and the Class and the fees and profits collected by Defendants in connection with the conduct complained of herein is available from their books and records.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a Class action.

## COUNT I

### BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

84.     Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

85.     Plaintiffs and the other members of the Class entered into account agreements with Defendants that constitute valid contracts, executed by both parties.

These contracts incorporate duties owed by Defendants arising by law, industry custom and standards, and public representations.

86.     Under New York law (which governed the Defendants' standardized financial advisory account agreements), and general contract law, the conduct of each party to a contract is subject to the implied covenant of good faith and fair dealing.

87.     Defendants had duties to exercise their contractual obligations to Plaintiffs and the other members of the Class with due and reasonable care, including the obligation to competently and honestly research, analyze, select investments and provide services, in exchange for account-related fees that Plaintiffs and the other members of the Class paid to Defendants.

88.     Defendants breached their contractual obligations to Plaintiffs and the other members of the Class to provide the services described herein, to provide such services to Plaintiffs and the other members of the Class with due and reasonable care, and/or negligently performed their services and responsibilities.

89.     Defendants breached their contractual duties and implied covenant of good faith and fair dealing by failing to perform the services expected and required from them for which they received fees.

90.     Plaintiffs and the other members of the Class have been damaged by Defendants' wrongful conduct.

91.     Defendants are liable to Plaintiffs and the other members of the Class for damages sustained as a result of their breaches of contractual duties and the implied covenant of good faith and fair dealing.

## COUNT II

## BREACH OF FIDUCIARY DUTY

92.     Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

93.     Defendants owed fiduciary duties to Plaintiffs and the other members of the Class who were their financial advisory clients to act in their best interests while performing their duties and discharging their responsibilities toward Plaintiffs and the other members of the Class to competently and honestly research, analyze, and select investments and provide services, in exchange for account-related fees that Plaintiffs and the other members of the Class paid to Defendants.  Plaintiffs and the other members of the Class placed their trust and confidence in Defendants and their financial advisors, who knew that Plaintiffs and the other members of the Class were relying on this trust and confidence as financial advisory clients.

94.     Defendants, acting in a negligent or grossly negligent manner, for self-interested reasons, or without due care or good faith, breached their fiduciary duties by (i) causing clients to be placed in Defendants' proprietary funds and investments without regard for whether such investments were in their clients' best interests and (ii) failing to perform their duties for Plaintiffs and the other members of the Class who were account-holders in the best interests of Plaintiffs and the other members of the Class.  Defendants acted disloyally, favoring their own financial interests over the best interests of their clients, and/or did not use the skill and due care required of a fiduciary in these circumstances.

95.     Defendants' conduct, as alleged herein, was undertaken with reckless or grossly negligent disregard of the rights or interests of Plaintiffs, the other members of the Class, and the public at large.

96.     As a proximate result of the Defendants' breaches of their fiduciary duties, Plaintiffs and the other members of the Class suffered damages.

97.     Plaintiffs have no adequate remedy at law.

## COUNT III

## UNJUST ENRICHMENT

98.     Plaintiffs incorporate herein by reference and reallege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

99.      Defendants have been unjustly enriched through a self-dealing scheme aimed at enriching themselves at the expense of Plaintiffs and the other members of the Class.

100.    Defendants received fees from Plaintiffs and the other members of the Class, directly or indirectly, by breach of fiduciary duty, violation of trust and other wrongful acts.

101.    Such fees have been wrongfully retained by Defendants at the expense of Plaintiffs and the other members of the Class.

102.    As a result of Defendants' unjust enrichment, Plaintiffs and the other members of the Class have suffered and continue to suffer damages.

103.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the other members of the Class pray for a judgment in their favor:

(1)  for an order determining that Counts I through III of this action constitute a proper class action, and certifying the Class as defined herein and appointing Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

(2)  for compensatory, special and general damages according to proof;

(3)  for prejudgment interest;

(4)  for appropriate equitable relief;

(5)  for disgorgement of all management fees paid, directly or indirectly, by Plaintiffs and the other members of the Class, directly or indirectly to any Defendant;

(6)  for an accounting of all damages caused, directly or indirectly, by Defendants to Plaintiffs and the other members of the Class;

(7)  for reasonable attorneys' fees and costs of investigation and litigation; and

(8)  for such other and further relief as the interests of law or equity may require.

## JURY DEMAND

Plaintiffs hereby demand trial by a jury on all issues properly triable before a jury.


Dated:   November 26, 2012                           Respectfully submitted,

                                                      SPERLING & SLATER


                                                       s/ Scott F. Hessell
                                                      Paul E. Slater (ARDC 2630567)
                                                      Scott F. Hessell (ARDC 6275119)
                                                      55 West Monroe Street, Suite 3200
                                                      Chicago, IL  60603
                                                      Telephone: (312) 641-3200
                                                      Facsimile: (312) 641-649

                                                      Jacob H. Zamansky
                                                      Edward H. Glenn, Jr.
                                                      Kevin D. Galbraith
                                                      ZAMANSKY & ASSOCIATES LLC
                                                      50 Broadway, 32nd Floor
                                                      New York, NY 10004
                                                      Telephone: (212) 742-1414
                                                      Facsimile: (212) 742-1177

                                                      Jay W. Eisenhofer
                                                      Dan L. Berger
                                                      GRANT & EISENHOFER P.A.
                                                      485 Lexington Avenue, 29th Floor
                                                      New York, NY  10017
                                                      Telephone: (646) 722-8500
                                                      Facsimile: (646) 722-8501

                                                      Joseph H. Meltzer
                                                      Peter H. LeVan, Jr.
                                                      Shannon O. Braden
                                                      KESSLER TOPAZ MELTZER
                                                        AND CHECK LLP
                                                      280 King of Prussia Road
                                                      Radnor, PA 19087
                                                      Telephone: (610) 667-7706
                                                      Facsimile: (610) 667-7056

                                                      *Attorneys for Plaintiffs*